[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 I
The plaintiff, Kysela Pere et Fils, Ltd., a wine import and distribution company from Virginia, has filed this collection suit[1]
to recover $39,909.50 owed to it by the defendant, the Elmwood Welding Corporation d/b/a Matias Importing and Distributing Company, for cases of wine delivered to the defendant. The defendant does not dispute that the wine was delivered or that the value was $39,909.50; rather the defendant argues, by way of a counterclaim, that the plaintiff has caused the defendant to suffer damages as a result of several alleged breaches of contract and other unlawful actions.
There are three main areas in dispute between the parties: first, the termination of an exclusive distribution agreement concerning the sale of CT Page 14025 French wines in Connecticut; second, the payment of a distribution fee for certain Portugese, [Portuguese], wines which were shipped into this country as a result of a joint trip to Portugal by the principals of both parties; and, finally, the payment of certain fees to the defendant when the plaintiff engaged in a practice known as "dualing."[2]
 II
General Statutes § 30-14 et seq. sets forth the statutory scheme for the import and distribution of alcoholic beverages. Essentially, the plaintiff is defined as out-of-state shipper under the terms of General Statutes §§ 30-17[3] and 30-18,[4] namely, one who imports wine into the state; and the defendant is defined as a wholesaler under the same statute, namely, one who distributes or sells to retailers, restaurants, cafes, etc. The plaintiff, which imports and sells wine in some forty-two states, is unable to sell directly to retailers; it must distribute its product through a wholesaler. The defendant, which also imports wines from Portugal, France and Chile, is unable to sell directly to a consumer; it must first sell to a retailer.
The first issue concerns the distribution arrangement for certain French wines. The evidence indicates that, in early 1994, the plaintiff entered into an arrangement with the defendant to sell certain wines in Connecticut. The plaintiff had apparently prearranged the sale to certain Connecticut retailers, but, as a company which did not have the requisite Connecticut license, it needed a wholesaler to distribute the product.[5]
In March and April 1994, the plaintiff prepared a number of federal label forms for the defendant to file with the Bureau of Alcohol, Tobacco and Firearms in order to import wine. After the plaintiff obtained a Connecticut importers license on October 27, 1994, it had the defendant transfer the registrations. The defendant argues that, in exchange, the plaintiff agreed to make it the sole and exclusive distributor of those and any other wines the plaintiff sold in Connecticut. In March 13, 1995, the plaintiff notified the Department of Liquor Control that the defendant would be the distributor of additional wines.
The testimony indicates that the parties agreed to an arrangement in which the defendant would be entitled to charge a retailer $6.00 per case for each of the plaintiffs cases distributed by the defendant. The value or cost of the wines was not controlling; each twelve-bottle case would have a six-dollar fee. The plaintiff would not pay the defendant that sum or deduct that sum from any invoice; rather, the defendant would add the charge to each case it delivered to a retailer. For a period of time, at least through 1996, the parties continued to do business together apparently to their mutual benefit. CT Page 14026
In 1996, the parties had discussions concerning importing wines from Portugal. In 1997, Ernest Matias, the principal of the defendant, at the request of Fran Kysela, the principal of the plaintiff, arranged a trip to Portugal to visit several vineyards for the purpose of purchasing Portuguese wines. In February, Kysela wrote to Matias with a list of dates and estates that he wished to visit. Matias contacted approximately seven wineries to set up appointments. Kysela, who had been traveling in Europe with Annette Peters, the plaintiff's former National Sales Director, met Matias and his wife and visited several vineyards.
According to Matias, the parties had a verbal agreement that his company would be compensated at the same rate of six dollars per case for each case that the plaintiff purchased as a result of the trip. He maintained that his company would receive this fee not only for those wines sold in Connecticut, where the defendant would be the wholesaler, but also throughout the country. The agreement was to last forever.
Kysela disputes this arrangement and moreover stated that there was no agreement for compensation on the wines that were purchased. He testified that he directed Matias to contact certain wineries that he had read about in a wine journal but that the two had made no financial arrangements. He stated that he spoke to Matias about this at a hotel but Matias stated that "when the wine comes, he'd tell him." Kysela insisted that they left Portugal without any agreement on terms. Correspondence in July and August, however, acknowledges both the purchase of Portuguese wines as well as the $6.00 add on per case. Matias further testified that after this trip the personal relationship between he and Kysela deteriorated. Letters between the two suggest two reasons: first, Kysela apparently failed to pay a hotel bill in Portugal, and the owners had contacted the defendant for payment; second, the plaintiff contracted directly with the Portuguese estates.
The plaintiff contests the allegations of the counterclaim. First, it maintains that it had the right to end the distribution of the French wines not only because there was no agreement precluding a termination of the relationship but also because it had procured the wines in the first instance and had procured the necessary federal licences. The plaintiff additionally maintains that it has not violated any agreement with the defendant as the wines that it imports and distributes through its new distributor, Worldwide Wines of Connecticut (Worldwide), are different from the wines it distributed through the defendant.
In June 23, 1998, Kysela wrote to the defendant indicating that he was terminating his business with the defendant. On July 2, 1998, he sent a letter to the Department of Liquor Control appointing Worldwide as the CT Page 14027 plaintiff s Connecticut wholesaler and indicating that, unless the defendant waived its right to be the exclusive distributor, the appointment of Worldwide would be effective six months from the receipt of this letter. An amendment was sent to the defendant on July 7, 1998.
On August 5, 1998, Kysela appointed Worldwide Wines of New York as the exclusive agent for six brands and it, in turn, appointed Worldwide Wines, Inc. of Cheshire as the exclusive distributor for Connecticut. This process of having two selling agents is known as dualing and is regulated under § 30-17.[6] On September 30, 1998, Kysela acknowledged that the June 23, 1998 notice he sent the Department of Liquor Control was improper and that the effective date of the dual would be January 8, 1999. On January 13, 1999, the plaintiff gave notice of its intention to appoint Worldwide as an additional distributor for four of the six wines mentioned specifically in the August 5, 1998 letter effective six months thereafter. That January letter also enclosed the same list of approved wines as included in the July 2, 1998 letter. On June 11, 1999, Kysela sent two notices to the defendant; one, that it was terminating all rights to distribute the plaintiff's products and, two, that it was "dualing" them with Worldwide Wines of New York and Worldwide Wines, Inc.
Evidently at a meeting with the Department of Liquor Control, the parties agreed that the dualing notice would be effective January 2000. While acknowledging that it shipped products to Worldwide during the notice period, the plaintiff maintains that the wines were different and that it never sold any wines previously distributed by the defendant to Worldwide until the dualing notice went into effect.
 III
As noted, the defendant maintains that the plaintiff breached its contract both by dualing and terminating the agreement and by importing wines directly into Connecticut in violation of this agreement. Moreover, the defendant maintains that these actions also constituted an unfair trade practice.
 A
It is clear to this court that if the plaintiff distributed wines to other wholesalers in violation of § 30-17, the CUTPA claim would be well founded. The evidence, however, does not indicate that at any time during the two-year dualing period the plaintiff sold Worldwide any of the same three products that it sold to the defendant. There is no question that the labels were similar, but the defendant has failed to prove that they were the exact same brands. The plaintiff had sold a label CT Page 14028 known as Travignoli Chianti Rufina to the defendant and sold Travignoli Chianti Rufina Reserva, with a different federal labeling number, to Worldwide. Kysela testified that the two wines differed both in grape type as well as in the aging process. Similar arguments were made as to Chateau de Segries Curvee Lirac Resevee sold to Worldwide and the Chateau de Segries, Lirac, sold to defendant, as well as the Huges deBeauvignac, Picpoul de Pinet sold to Worldwide and the wine with a different name, Huges de Beaulieu, Picpoul de Pinet, sold to the defendant.
This court finds the definitions and rulings by the Bureau of Alcohol, Tobacco and Firearms to be persuasive on this issue. ATF Ruling 81-7 states, in relevant part:
 The Bureau of Alcohol, Tobacco and Firearms has received a number of inquiries regarding the meaning of the term "brand" as used in 27 C.F.R. § 6.83, 6.85, and 6.91. The term "brand" is used in these regulations to differentiate between various wine, distilled spirits, and malt beverage products. Each of these regulatory sections permits industry members to furnish certain things of value to retailers subject to dollar or quantity limitations which are established on a per-brand basis.
* * *
 HELD, in sections 6.83, 6.85, and 6.91, the term "brand" refers to differences in brand name of a product, differences in nature of a product, or differences in color or design of a label. Thus, examples of different brands would be products having a different: brand name; class, type, or kind designation; appellation of origin (wine); age (distilled spirits); proof (distilled spirits); or label design or color. Differences in packaging such as a different style, type, or size of container are not considered different brands.
The testimony from Kysela that the wines are different in both age and grape type would mean that they are not the same brand. As noted by the plaintiff, other states have adopted this same approach. See, e.g., Ga. Comp. R. Regs. r. 560-2-2.01; Tenn. Code Ann. § 57-3-301; Va. Code Ann. § 4.1-401. This same view of different brands was adopted by the court in Jim Taylor Corp. v. Guinness Import Co., 897 F. Sup. 556 (MD. CT Page14029 Fla. 1995), in which the court upheld the defendant's tight to chose a different distributor for its new brand of beer, Moosehead Canadian Ice, notwithstanding the plaintiff's contractual right to distribute certain other brands, Moosehead and Moosehead Light. The court noted that the State of Florida had issued a separate brand number for the new beer. Id., 557-58 n. 1.
In the present case, the Connecticut Department of Consumer Protection has similarly treated the brands differently. This court therefore finds that the defendant has failed to prove that the plaintiff was selling the same wines to Worldwide in violation of § 30-17 during the dualing period.
Related to this issue, of course, is the CUTPA claim, General Statutes § 42-110b (a). Inasmuch as this court finds no violation of §30-17, it does not find a violation of CUTPA. While the plaintiff may have sold wines to Worldwide, it did not do so in violation of the liquor distribution statutes. Indeed, there is no prohibition of utilizing different wholesalers to sell different products.
 B
The defendant's third claim, that it had a continuing right to distribute the plaintiff's wines, is controlled by our statute of frauds. General Statutes § 52-550 provides in relevant part: "(a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: ... (5) upon any agreement that is not to be performed within one year from the making thereof ...." Without any formal writing, the defendant maintains that it is entitled to distribute the plaintiff's wines forever. It is clear that the statute of frauds precludes this claim. While the parties surely could and indeed did have an arrangement that the defendant would distribute certain wines for the plaintiff and be entitled to a commission on the distribution, this arrangement, without a more formal writing, cannot control future actions. The alleged agreement falls within the statute and is therefore unenforceable. Burkle v. SuperflowMfg. Co., 137 Conn. 488, 492-97, 78 A.2d 698 (1951).
 C
The final claim concerns the procurement of the Portuguese wines resulting from the 1997 trip. The facts indicate to this court that the defendant not only made the arrangements for the trip but also was responsible for the resulting purchases. The plaintiffs position that there was never any understanding between the parties simply is not CT Page 14030 persuasive in light of the prior business between the two entities. It is surely unlikely that the defendant would have taken the time and expense to arrange such a trip without the expectation of financial gain. As noted, the relationship between the parties terminated as a result of this trip. The only evidence presented to this court at trial indicates that the plaintiff imported, through Worldwide, 119 cases of Romariz product between May 1999 and June 2001. The defendant is entitled to its six dollar per case commission for these bottles.
 IV
In summary, this court finds for the plaintiff on its claim against the defendant in the sum of $39,909.50. This court further finds that the defendant has failed to produce sufficient evidence to prove its counterclaims with the exception of the claim dealing with the Romariz wines imported by the plaintiff. For this claim, the defendant is entitled to an offset of $714.00. Judgment enters for the plaintiff in the sum of $39,195.50.
Berger, J.